**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**


**KEVIN KJONAAS, et al.**
**Petitioner**

**v.**

**UNITED STATES**
**Respondent**


**Civil No. 12-  (AET)**

_____

**BRIEF IN SUPPORT OF DEFENDANT KEVIN KJONAAS'**
**PETITION FOR HABEAS CORPUS RELIEF PURSUANT**
**TO 28 U.S.C. § 2255 AND REQUEST FOR EVIDENTIARY HEARING**

_____

Robert G. Stahl
Laura K. Gasiorowski
Law Offices of Robert G. Stahl, LLC
220 St. Paul Street
Westfield, New Jersey 07090

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. iii

STATEMENT OF THE CASE....................................................................................................1

STATEMENT OF FACTS ..........................................................................................................2

ARGUMENT:
POINT I ......................................................................................................................……..10

KEVIN KJONNAS WAS DENIED EFFECTIVE REPRESENTATION
OF COUNSEL ...........................................................................................................................10

      A.  COUNSEL'S LACK OF PREPARATION CONSTITUTED
          CONSTRUCTIVE DENIAL OF COUNSEL IN WHICH
          PREJUDICE IS PRESUMED.......................................................................................11

      B. COUNSEL'S CONFLICT OF INTEREST CREATED A
          PRESUMPTION  OF PREJUDICE.................................................................................14

      C.  COUNSEL'S PERFORMANCE FELL BELOW THE STRICKLAND
          STANDARD.................................................................................................................15

POINT II ......................................................................................................................................21

COUNSEL DENIED HIS CLIENT THE CONSTITUTIONAL RIGHT
TO TESTIFY AND DENIAL OF THIS RIGHT IS STRUCTURAL ERROR
AND A VIOLATION OF DUE PROCESS. ...…………..……………………………………21

Baker v. Barbo, 177 F.2d 149 (3rd Cir.1999)…………………………………………..12

Bell v. Cone, 535 U.S. 685 (2002)……………………………………………..12,13

Cuyler v. Sullivan, 466 U.S. 335 (1980)………….…………………………...14

Davis. v. United States, 417 U.S. 333(1976)……………………………………10

Gideon v. Wainwright, 372 U.S. 335 (1963)…………………………………….11

Government of the Virgin Islands v. Weatherwax ("Weatherwax I") 20 F.3d 572 (3d Cir.1994), rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II") 77 F.3d 1425 (3d Cir.1996), cert. denied, 519 U.S. (1996)…………………………………………………………..16

Hayes v. Cain, 298 F.3d 375 (5th Cir.2002)….13

Kimmelman v. Morrison, 477 U.S. 365 (1986), on remand, Morrison v. Kimmelman, 540 F.Supp. 801 (D.N.J. 1986)………………………………………………...11

Lindstadt v. Keane, 239 F.3d 191 (2d Cir.2001)………………………………….14

Luce v. United States, 469 U.S. 38 (1984)…………………………………………17

Marshall v. Hendricks, 313 F.Supp.2d 423 (D.N.J.2004)("Marshall VI")…………13

Martínez  v. Ylst, 951 F.2d 1153 (9th Cir.1991)……………………………………..17

McKaskle v. Wiggins, 465 U.S. 168 (1984)…………………………………………26

Owens v. United States, 48 F.3d. 48 (1st Cir.2007)……………………………17

Palmer v. Hendricks, 592 F.2d 386 (3d Cir.2010)…………………………………. 24,25

Rock v. Arkansas, 483 U.S. 44 (1987)…………………………………………  16, 21

Scarpa v. Dubois, 38 F.3d 11Cir.1994)……………………………………………. 14

Strickland v. Washington, 466 U.S. 668 (1984)…………………………………… infra

United States v. Booth, 432 F.3d 542 (3d Cir.2005)………………………………   10

United States v. Campos, 930 F. Supp. 787 (E.D.N.Y. 1996)……………….…….. 17

United States v. Cronic, 466 U.S. 648 (1984)……………………………………… 11, 12

United States v. DiSalvo,  726 F.Supp. 596 (E.D.Pa.1989)…………………………24

United States v. Gray, 878 F.2d 702 (3rd Cir.1989), appeal after remand 902 F.2d 1562 (3d Cir.1990)…………………………………………...15, 16

United States v. Lore, 26 F. Supp.2d 729 (D.N.J.1998)…………………………..21

United States v. Pavel,  261 F.3d 210 (2d Cir.2001)………………………………16

United States v. Poe, 352 F.2d 639 (C.A.D.C. 1965)………………………………  22

United States v. Teague, 953 F.2d 1525 (11th Cir.), cert. denied,  506 U.S. 842 (1992)……………………………………………………………...21, 23

United States ex rel. Wilcox v. Johnson, 555 F.2d 115 (3rd Cir.1977)………………22

# STATEMENT OF THE CASE

Kevin Kjonaas was tried with his co-defendants before this Court in <u>United States v. SHAC</u>, et. al, case 04-373 (AET). Petitioner was convicted on all six counts of the Indictment, which alleged a Conspiracy to violate 18 U.S.C. §43, (Animal Enterprise Terrorism Act); Conspiracy to violate 18 U.S.C. § 2261, and three substantive violations of Interstate Stalking and a substantive count of Harassment, 47 U.S.C. § 223 on March 2, 2006. This Court rejected the Rule 29 motion, deferring Petitioner's claims of ineffective assistance as more properly the subject of the instant § 2255 motion.

Petitioner was sentenced on October 2, 2006 to a total of 72 months. Petitioner filed a timely Notice of Appeal on October 4, 2006. On October 14, 2008, the Third Circuit Court of Appeals affirmed the district court's judgment, under docket 06-443. <u>United States v. Fullmer</u>, 584 F.2d 132 (3d Cir.2009). Point I argued there was Insufficient Proof of the Elements of 18 U.S.C. § 43; Point II raised the issue of whether the jury was permitted to rely on a legally incorrect theory of conviction; Point III claimed an incorrect jury instruction as to 18 US.C. § 43 was given; Point IV raised a violation of due process claim that the defendants were held criminally responsible for conduct they could not have understood as violating 18 U.S.C. § 43; Point V argued that the cumulative effect of improperly admitted evidence required reversal; Point VI argued that there was insufficient proof the conspiracy to violate 18 U.S.C. 2261(A)(2); Point VIII argued that the aiding/abetting theory was flawed and the final point argued a constructive amendment of the Indictment. Petition for Rehearing en Banc was filed timely, and denied June 6, 2010. A Petition for a Writ of Certiorari to the Supreme Court was timely field, and denied on March 3, 2001 ( Supreme Court docket 10-7187).

**Statement of the Facts**

Eric Schneider, trial counsel in this case, was hired only after the Petitioner Kevin Kjonaas' first trial ended in a mistrial because of the medical illness of his first attorney, Isabel McGinty. (Kjonaas Affidavit at 1). Schneider represented himself as an experienced attorney, with particular expertise in animal rights cases. (Id.). He was eager to be hired on, more so when he began getting speaking engagements and invitations to other events because of his connection to a high publicity trial. (Id. at 3). The SHAC case had the potential to catapult this Ulster County defense attorney into larger, more prominent cases. He assured his client that he had substantial experience and that his tenure at a large firm made him particularly capable to handle a large, complex trial such as the SHAC case proved to be.

Schneider's enthusiasm in being hired did not extend to his preparation for the trial that was rapidly approaching. New to the case, and with no grasp of the huge volume of discovery produced by the Government or the complex issues of the case, Schneider had a lot to catch up on. He did not have immediate possession of any of the primary materials, and was unfamiliar with the discovery or the legal issues that had been raised thus far. Ms. McGinty had moved ten of her file boxes, and custody of the Government's massive discovery, to the Philadelphia offices of Andrew Erba, lawyer for the corporate defendant. (Erba Affidavit, 1-7, 9). Although he was hired in the fall of 2005, it was not until about January 4, 2006, a month before the trial, that Schneider finally traveled to Erba's office in Philadelphia to review that discovery. (Kjonaas Aff.; Erba Aff., para. 18-21). At an evidentiary hearing, Kjonaas would testify further that Schneider spent only six hours looking at discovery that day. He did not finish reviewing

the 1000 series of Government exhibits, nor any of the remaining discovery that was not marked. (Kjonaas Aff. at para. 9-10). Incredibly, Schneider did not watch any of the videotapes, many of which were later introduced at trial, nor listen to the approximately 600 audiotapes of intercepted conversations, many of which involved Kevin and were to be major parts of the Government's case. (Id.) Schneider made no photocopies of any of the material, nor did he request that Erba provide any. (Id.) The following day, Mr. Schneider and Mr. Kjonaas returned to Andy Erba's office to continue their document review. On that day, Eric Schneider spent no more than three hours reviewing the 1000 series of Government exhibits before quitting, promising Kevin that he would return to the office and complete the review before trial. (Id.) He never did, and the ten hours or so he spent over those two days comprised his entire effort to review the discovery and exhibits.

Adequate preparation for this case entailed reviewing, at a bare minimum, thousands of page of discovery, hundreds of audiotapes, and numerous videos. (McGinty Aff., paras. 1-5). Careful review of the discovery was necessary not only to understand the case against the defendants, which alleged two conspiracies and substantive cyberstalking crimes, but also to isolate and develop exculpatory information which demonstrated the lawfulness of the actions, purposes and motives of Mr. Kjonaas and SHAC USA. (Id., para. 9). In addition to this preparation, there was the necessity of parsing the indictment and the Government's case, and understanding complex legal questions, many involving substantial constitutional questions and issues of statutory construction. Counsel would also have to be completely familiar with all relevant discovery in order to adduce the testimony of any witnesses, in particular, that of Mr.

Kjonaas.  Obviously, counsel also had to be completely familiar with all of the discovery and more particularly, the videotapes and audiotapes that featured his client, in order to prepare the witness to testify.

Part of the defendant's joint defense was that much of their activity was protected by the First Amendment, and that harassment and threats allegedly made by others as part of the conspiratorial agreement was actually done without the approval, agreement, or knowledge of the defendants.  It was also apparent that very often there was a substantial lag of time between the postings that allegedly constituted the criminal conduct, and the subsequent acts that these postings allegedly incited. To this end, it was essential that the attorney be familiar with the content and context of the web pages, testimony, videotapes, and audiotapes to be entered in as evidence and to review same with the defendants.  The defendants also viewed and intended SHAC to be conducting only legal protest activities; further the SHAC website was not meant to threaten or intimidate others, but to provide information and news to animal rights activists and like minded individuals.  Criminal intent, and thus the defendant's state of mind, was the focal point of the Government's case, as it would prove the necessary *mens rea* through circumstantial evidence.  This in turn made the potential testimony of Kevin Kjonaas, who was the president of SHAC and the defendant facing the most severe penalty, extremely important as it would be the only evidence to challenge the Government's theory of guilt.

Despite the daunting task before him, Eric Schneider ignored his obligation to familiarize himself with the facts and the law.  The objective evidence indicates that Mr. Schneider performed only a cursory review of the discovery in the case, and more importantly failed to review some of the most highly controversial, prejudicial, and

compelling evidence presented by the Government at trial. He did no investigation or witness interviews on his own, and failed to complete assignments given to him by other members of the defense team to conduct necessary investigation. (Kjonaas Aff., para. 17). Mr. Kjonaas can relate, as an example, how Robert Obler and Andy Erba became irate with Schneider who admitted, only after the defense had flown in witnesses for trial, that he had failed to investigate, or interview these witnesses and had no idea what their testimony would be. (Id., para 20) In particular, one witness, a female animal rights activist, was to have testified that Mr. Kjonaas had nothing to do with alleged SHAC demonstrations in Texas, which were actually organized by another individual, without Mr. Kjonaas' knowledge or input. (Id.) As the unlawful protest activities in Texas were some of the more damaging evidence assembled by the Government in its case, the focal point of which were the victims of the stalking offenses, testimony that Kjonaas had nothing to do with the animal rights activities against Marsh in Texas, and did not agree to or condone these demonstrations, was potentially exculpatory because the Government's theory was that SHAC, through Kevin, picked the Texas targets, coordinated the protests, and encouraged "direct action" techniques.

Schneider's lack of preparation was evident in other ways. He was unprepared and incapable of meeting that evidence head on, both before trial, by way of pre-trial motions *in limine*, and at trial, by way of cross examination, rebuttal evidence or evidentiary objections. He did not file any motions, nor follow up on the outstanding motions in limine regarding the Brian Cass evidence, the radio interview, and other 404(b) and 403 issues. He failed to make contemporaneous objections to objectionable evidence, or to the jury instructions. Co-counsel shared the view that Mr. Schneider was

lax in reviewing material, and did not seem to comprehend the complexity of the case, or understand the Government's theory. (Erba Aff., para. 14-22). Schneider filed no response to Government motions and failed to argue those motions heard by the Court. (Id., para 24-28). It was the belief of Mr. Erba, based on his review of the docket, that Mr. Schneider had failed even to secure permission to file motions and responses, or receive the Court's orders, electronically. (Id. at 30). Schneider's unfamiliarity with the basics of federal trial practice in New Jersey was evidenced later, when he was at a loss as to how to obtain transcripts during the trial. (McGinty Aff.).

Schneider was so unfamiliar with the basic facts and criminal conduct alleged in the Indictment that he needed Kevin's assistance in identifying and explaining who the individuals and corporations identified by their initials in the Indictment actually were, on the eve of trying his case. (Kjonaas Aff., para. 15). He requested that the client prepare proposed cross examination questions and testimony summaries for the trial witnesses because he himself was so unfamiliar with the facts and participants. (Id. at para.21, McGinty Aff, para.20).

Schneider's failure to prepare was readily apparent in his disastrous cross-examination of Brian Cass, in which he was probably the only person in the room, other than the jury, who did not know that the Cass' assailants in his brutal beating were masked. (02/07/06 Tr.) Thus when he asked Mr. Cass if Mr. Kjonaas was one of Cass' assailants, Schneider inadvertently suggested to the jury that Kjonaas may have been, as the witness' answer was, of course, that he did not know for certain because the attackers were masked. As to other main witnesses, Schneider did not bother, in most cases, to cross-examine at all, and when he did, confined his cross-examination to the litany of

questions regarding whether the witness knew his client, recognized his client, or received any mail or e-mail or phone calls from his client. He seemingly did not understand the concept of conspiratorial or Pinkerton liability, or understand from the facts or the Government's case that their theory of liability was not that Kevin himself made threatening calls or committed vandalism but that he aided and abetted this conduct, or directed it, as part of the larger conspiracy against HLS. Given that a large portion of the allegedly harassing behavior set forth in the indictment and the Government's evidence was anonymous in nature, and alleged to have been done by co-conspirators, or aided and abetted by Kjonaas, such questions were not only unnecessary but invited responses prejudicial to Kjonaas. It was a "defense", if one can all it that, which was the product of his unfamiliarity with the facts and lack of any understanding of the law, as opposed to a "strategic" decision, which implies that Schneider was knowledgeable enough to make a reasoned choice to pursue one avenue over another.

Throughout the trial, Schneider failed to object to clearly inadmissible evidence, much of it extremely prejudicial to his client. Schneider failed to raise the proper 404(b) and 403 objections to evidence of Brian Cass's assault, including the photograph. He failed to object to Sally Dillenback's incredibly prejudicial testimony regarding her son, and her husband's purchase of a gun. He failed to object to Marion Harlos' testimony about the Plano Police and the school board making a determination that additional security was necessary at the school because if it had been made a target by SHAC, the children would be threatened. He was, as the saying goes, asleep at the wheel.

Fellow co-counsel was also cognizant of Schneider's disastrous handling of witnesses. (Erba Aff., para. 41). Counsel was also surprised by Schneider's apparent

lack of any strategy for addressing the impact of the audiotapes, conducting cross-examination of critical witnesses, and presenting an actual defense, which included introducing numerous documents and other evidence of Kjonaas' efforts to conduct legal protests and demonstrations. (Erba Aff., para. 41, 43, 44-45). Kevin was, after all, the main or lead defendant and it would have been unfairly prejudicial to the other defendants for their counsel to cross-examine witnesses unrelated to their alleged conduct in an effort to pick up the slack.

Schneider's failure to investigate or prepare the case also prevented him from meeting the Government's case at all. As the affidavits set forth, there are hundreds of intercepted telephone calls and e-mail messages and documents that Schneider neglected to sift through for facts that could counter the prosecution's case as to the requisite criminal intent, and the conspiratorial agreement. ( See McGinty Aff., para. 1-5; Kjonaas Aff., at para. 14, 30-32; Erba Aff., *infra*). As Kjonaas would testify to in an evidentiary hearing, for every allegedly incriminating conversation or web page, there was context which might have presented the evidence in a different light to the jury. Although the Government painted SHAC as an illegal organization with a criminal object, there was substantial evidence of the group's legal attempts to secure permits and operate under court ordered time, place and manner injunctions for legitimate demonstrations .

Although Schneider had professed agreement with prior counsel, Ms. McGinty, and the client, that Kevin Kjonaas's testimony would be absolutely essential to the presentation of a defense to the Government's case, he did not make any effort to prepare Kjonaas to testify. (Id., paras 7-8, 14-16). Schneider's opening, however, made mention of personal information that Kevin Kjonaas would provide to the jury, implicitly

promising the jury something that Schneider would not and could not deliver upon. (Erba Aff., para. 40).    Indeed, in the midst of trial, Schneider insisted that Mr. Kjonaas write out his own direct as he did not have sufficient basis to do so himself. (McGinty Aff., para. 21).  Kevin enlisted the aid of Isabel McGinty in preparing the direct examination for Kevin, and Schneider insisted that she help him, acknowledging that he was incapable of doing it without her assistance. (McGinty Aff. at paras. 23-27).  Very soon Ms. McGinty realized that there was no way, even with her assistance, that Schneider could prepare himself to conduct his client's direct examination; he had given no indication that he was at all familiar with the charges, the penalties or the evidence, and he certainly had no idea where to begin in preparing his client to testify in his own defense. (McGinty Aff. at para. 33).  McGinty nevertheless attempted to offer any assistance she could in bringing him up to speed (mid-trial) and setting the stage for Kjonaas to testify.

After preparing a draft outline of a partial direct, she later informed Mr. Schneider that she could not, in good faith, assist him, as his lack of familiarity with the witnesses, facts, events and indeed, SHAC itself, would make it impossible for him to utilize the direct examination she had prepared at trial.  (Id. at 32) When she refused to give him what she had prepared, Schneider offered to pay her for her draft of a direct, perhaps assuming that the amount of time McGinty had devoted was the issue. (Id., at para. 37). McGinty informed Schneider that it was not an issue of getting paid for her time; she was convinced he could not assist Mr. Kjonaas effectively and advised him to inform the Court, or Mr. Kjonaas, that he could not proceed.  (McGinty  Aff. at para 33-39).   She also advised him to tell the client.

Mr. Schneider did neither.  As the prosecution rested, Kjonaas was still unaware

of what defense, if any, his attorney would present, but presumed that he would testify. Because McGinty could not and would not supply him with a direct examination for the client, however, Schneider told Kjonaas that his testimony was not an option; he could not conduct the direct. (Kjonaas Aff., *infra*).  He did not tell Kjonaas that he had a right to testify in a narrative form, nor that it was his decision alone to exercise or waive that right.  (Id).  Kjonaas believed that he had no choice, that his attorney had made the decision that he would not testify, and that he could not testify without his attorney directing him.  (Id.)  He was afraid to voice his concerns regarding his attorney's lack of preparation and his inadequate performance to the Court, fearful that the Court would believe that he was simply stalling, using the total breakdown in communications with his attorney and complaints about his performance as a basis for a continuance, as the Government had suggested Ms. McGinty's illness in the first trial had been.    When counsel told him that he had no questions for him, Kevin Kjonaas believed that he had no other option but to remain silent.  He did not testify, and was convicted on all counts.

## ARGUMENT

## POINT I

## KEVIN KJONAAS WAS DENIED EFFECTIVE REPRESENTATION OF COUNSEL

This petition raises an ineffective assistance of counsel claim.  This is not merely a case of incompetence, or bad lawyering, however.   In this case the facts present a complete failure of advocacy, amounting to the equivalent of no representation.  Without a grounding in the facts or any understanding of the legal issues, Schneider could not have possibly subjected the prosecutor's case to "meaningful adversarial testing."  This constructive denial of counsel requires no showing of prejudice.  Even if prejudice were

not presumed, however, Mr. Schneider's substandard performance, which robbed Kevin Kjonaas of his fundamental right to testify, clearly constituted ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and its progeny and prejudiced his client's trial. Eric Schneider's ineffective assistance, and his denial of his client's right to testify, violated Kjonaas' constitutional rights under the Fifth, Sixth and Fourteenth Amendments, and constitutes "fundamental defect which inherently result[ed] in a complete miscarriage of justice" permitting relief by this Court. <u>Davis v. United States</u>, 417 U.S. 333, 346 (1976). Because the Petitioner has made a particularized, and sufficient showing of a colorable claim of both objectively unreasonable advocacy and prejudice, he is entitled to an evidentiary hearing. <u>United States v. Booth</u>, 432 F.3d 542, 545-46 (3d Cir.2005)(evidentiary hearing required to determine ineffectiveness of counsel in failing to list plea options).

**A.** **<u>Eric Schneider's Lack Of Preparation Constituted A Constructive Denial Of Counsel In Which Prejudice Is Presumed</u>**

"The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process**."** <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986), <u>on</u> <u>remand</u>, <u>Morrison v. Kimmelman</u>, 540 F.Supp. 801 (D.N.J. 1986), <u>citing</u> <u>Gideon v. Wainwright</u>, 372 U.S. 335, 344 (1963); <u>see</u> <u>also</u> <u>United States v. Cronic</u>, 466 U.S. 648, 655 (1984). It follows, then, that the "essence" of an ineffective assistance of counsel claim is when defense counsel's unprofessional errors so upset this delicate adversarial balance as to undermine the fairness of the trial and thus the legitimacy of the resulting verdict. <u>Kimmelman</u>, <u>citing</u> <u>Strickland v. Washington</u>, 466 U.S, at 686.

The well-settled standard by which ineffective assistance of counsel is evaluated is a two part test, as set forth in Strickland v. Washington, in which the defendant must show both that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." Id. at 687. This standard for prejudice "is not a stringent one;" it is less demanding than the preponderance of the evidence standard. Baker v. Barbo, 177 F.2d 149, 154 (3rd Cir.1999).

This case, however, is more appropriately evaluated under United States v. Cronic, supra. As the Court opined in Strickland, actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice, relieving the defendant of the burden of proving that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, supra, 466 U.S. at 659, 694. In Cronic, the Supreme Court acknowledged that there are certain types of conduct that are in general so antithetic to effective assistance of counsel, such as the attorney who is absent from crucial stages in the proceeding, that no matter the facts of a given case, conduct of that type will almost always result in prejudice. Id. at 658-59. Thus, the court may find such presumptive prejudice when there is "a complete denial of counsel" at a critical stage in the proceedings; where counsel "entirely fails to subject the prosecutor's case to meaningful adversarial testing"; or where counsel could not render competent assistance. Bell v. Cone, 535 U.S. 685, 695-96 (2002), quoting, Cronic, supra, 466 U.S. at 659. Similarly, prejudice will be presumed where counsel has a conflict of interest and this interest affects his performance adversely. Strickland, supra, 466 U.S. at 692 (citation omitted). In this instance, an attorney's failure to do any pretrial investigation or preparation, and its resultant lapses in

presenting a defense, is "so likely to prejudice the accused" that prejudice should be presumed.

The facts as set forth in the affidavits, and as would be further developed in an evidentiary hearing, establish that Eric Schneider's complete abandonment of his duty to investigate and prepare this case constituted constructive denial of counsel. His review of the discovery and of the Government's exhibits was minimal, and for all practical purposes, non-existent for a case of this dimension. He did no independent investigation, failed to interview witnesses, and was unfamiliar with the basic facts and the legal issues in the case, requiring his client to educate him during trial as to the identity of the Government's witnesses, the substance of their testimony and the most basic of facts regarding the offenses. Because he was unprepared both as to the facts, and the legal theories, he was incapable of mounting any defense and indeed, put on no meaningful defense at all. His "defense" consisted solely of cross examining witnesses as to whether or not they could identify his client, who was charged with a conspiracy and with an incitement theory by which he would be responsible for the acts of others

Although Schneider did some cross examination, and conducted an opening and closing statement, his ineffectual effort at a defense does not prevent the <u>Cronic</u> exception from applying. The presumption of prejudice arises when counsel "entirely fails to subject the prosecution's case to **_meaningful_** adversarial testing." <u>Bell v. Cone</u>, 535 U.S. at 696 (emphasis added), <u>citing</u> <u>Cronic</u>, 466 U.S. at 658. Here, counsel's total lack of preparation _de facto_ precluded him from making any **<u>meaningful</u>** attempt to challenge the prosecution's case. While the failure to oppose the prosecution's case at specific points, or the concession of certain elements to focus on others, may be tactical

decisions outside of <u>Cronic's</u> purview, <u>see</u> <u>Hayes v. Cain,</u> 298 F.3d 375, 380-81 (5th Cir.2002), counsel's failures here were not creatures of choice, but the consequence of his abandonment of his duties as an advocate, and this is the type of extreme case to which <u>Cronic</u> is specifically applicable.

The Affidavits, particularly those of Erba and McGinty, demonstrate that Kjonaas effectively had no advocate, and that Schneider's lack of preparation and inability to put his client on the stand were not tactical decisions entitled to deference, but consequences of his <u>dereliction</u>. A decision implies that there was some reasoned thought process by which various factors were weighed and balanced and a choice among different options chosen. <u>See</u>, <u>Marshall v. Hendricks</u>, 313 F.Supp.2d 423, 443-44 (D.N.J.2004)("<u>Marshall VI</u>"). However, Schneider made <u>no</u> informed decisions, because he was not prepared for the case. It is impossible to conceive how this attorney's lack of familiarity with the case, and absolute failure at any semblance of diligence did not provide Kjonaas with a much different trial than the one he would have had with a competent, prepared attorney. <u>Lindstadt v. Keane</u>, 239 F.3d 191, 204 (2d Cir.2001), <u>citing</u> <u>Williams v. Washington</u>, 59 F.3d 673, 682-85 (7th Cir.1995). Indeed, "…if an attorney does not grasp the basics of the charges and the potential defenses to them, an accused may well be stripped of the very means that are necessary to subject the prosecution's case to adverse testing. " <u>Scarpa v. Dubois</u>, 38 F.3d 1, 10 (1Cir.1994), <u>citing</u> <u>Strickland</u>, 466 U.S. at 688. That is exactly what transpired in this case.

B.      **<u>Counsel's Conflict of Interest Created a Presumption of Prejudice</u>**

<u>Strickland</u> acknowledged that beyond actual or constructive denial of counsel, an attorney's conflict of interest, coupled with evidence that it adversely affected his ability

to represent the defendant, would create a presumption of prejudice. Id. at 692, citing Cuyler v. Sullivan, 466 U.S. 335,350, 348 (1980). Although Eric Schneider was not representing multiple defendants, he was burdened by a conflict of interest nonetheless and that conflict adversely affected his performance in representing Kjonaas.

Schneider was eager to take this case, in part because it was a high publicity case. He was excited by the requests of different organizations to attend seminars or speak at different events after the trial. (Kjonaas, Aff. at 11). He misrepresented his experience and his abilities to handle a complex federal trial, and misled the client as to his ability and willingness to exercise the required diligence in order to stay on the case. (Id., para. 4, 8). Schneider faced the inevitable result of his lack of preparation, which was an inability to mount any kind of meaningful response to the Government's case. He had an obligation to the client to advise the Court of his inability to put Kjonaas on the stand, and to request a continuance. He had an obligation to tell his client that his right to testify was absolute, and his to make. He had the obligation to tell the client that he could provide this testimony in narrative form, without the assistance of counsel. He did nothing. Whether he was fearful of angering the court, of confessing his lack of preparation, or of blackening his reputation, or a combination of all, Schneider put his own self interests above those of the client. He breached a duty of loyalty when he sought to preserve his own stature over the client's right to effective representation and this requires a Cronic finding of *per se* prejudice and the requested relief.

## C.     Counsel's Performance Fell Below the Strickland Standard

Assuming, for purposes of argument, that Eric Schneider's errors do not constitute constructive denial of counsel, or fall under the Cronic/Bell line of cases,

Kjonaas can nonetheless affirmatively demonstrate that his performance fell below an objective standard of reasonableness, and that his defective performance resulted in prejudice.  See Strickland, supra.

The Third Circuit Court of Appeals is in agreement with the other courts of appeals that failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness. United States v. Gray, 878 F.2d 702, 711 (3rd Cir.1989), appeal after remand, 902 F.2d 1562 (3d Cir.1990) (further citations omitted).  As the Court in Gray observed, ineffectiveness is generally clear in the context of a claim of failure to investigate "because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." Id., citing , Strickland, supra, 466 U.S. at 690-91. Thus, while courts are reluctant to challenge a lawyer's "strategic" decisions, such as whether to call witnesses, or to pursue certain evidence, United States v. Pavel,  261 F.3d 210, 217 (2d Cir.2001)(further citations omitted), that reluctance dissipates when an attorney's "tactical" decisions evidence "ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles" as such actions amount to ineffective assistance of counsel.  Government of the Virgin Islands v. Weatherwax ("Weatherwax I") 20 F.3d 572, 579 (3d Cir.1994), rev'd on other grounds, Government of the Virgin Islands v. Weatherwax ("Weatherwax II") 77 F.3d 1425, 1435 (3d Cir.1996), cert. denied, 519 U.S. 1020 (1996), citing ABA Standards for Criminal Justice, Commentary at 4.67-68; see also, Gray, supra (counsel's abdication of duty to investigate constituted lack of diligence, not strategy, and accordingly fell below the minimum standard of reasonably professional representation).  Similarly the failure of an attorney to advise his client of his

right to testify can constitute ineffective assistance. Since this right is a fundamental right guaranteed to the defendant, <u>Rock v. Arkansas</u>, 483 U.S. 44, 55-56 (1987) and exclusively his to exercise, counsel's denial of that right alone falls below an objective standard of reasonableness. <u>United States v. Campos</u>, 930 F. Supp. 787, 790-93 (E.D.N.Y. 1996)(further citations omitted).

Here, the affidavits of Erba, McGinty and Kjonaas all make a sufficient factual showing that Eric Schneider failed to investigate or prepare this case. While there is no set number of hours required by the courts in order to find effective assistance of counsel, here there is no legitimate reason for the extremely limited review of discovery, or the total failure to investigate the case, interview witnesses, or familiarize himself with the Government's evidence. Schneider never reviewed the extensive videotapes and audiotapes of wiretapped conversations involving his client, which were later offered at trial as evidence, and were never placed into context or otherwise contested because Kjonaas did not testify. He did not make any motions, or follow up on the motions in limine pending. At trial, he did not object to the admission of evidence which was either irrelevant, or unduly prejudicial, or both. He was so ignorant of the basic facts of the case and the legal theories that he requested his client to compose cross examination questions, identify the conspirators and witnesses, and prepare his own direct examination. When that failed, he requested prior counsel to do so, without requesting a continuance or making any other reasonable effort to bring himself up to speed. He did all this in the midst of trial, having assured all parties prior to trial, that he was in fact prepared.

The second <u>Strickland</u> prong is also easily met. As the Court held in <u>Owens v.</u>

United States, "[a] defendant's testimony could be crucial in any trial, and it could be difficult for us to determine whether or not a jury would have found his testimony credible." 48 F.3d. 48, 59 (1st Cir.2007), citing Luce v. United States, 469 U.S. 38, 42 (1984) ("[An] appellate court could not logically term 'harmless' an error that presumptively kept the defendant from testifying.").  In addition to the notion that the right to testify is a basic component of the very nature of our system of justice, the right to testify may in some cases, as in this one, provide the defendant his only opportunity to respond to the Government's charges, and to present a voice other than that of Government which speaks to his intent.  In this case, the combined failure to counsel to mount any defense, and then to deny the client his right to testify and offer the only semblance of a "meaningful adversarial testing" of the case against him necessarily must have prejudiced the defendant.  Martínez v. Ylst, 951 F.2d 1153, 1157 (9th Cir.1991) ( "it is only the most extraordinary of trials in which a denial of the defendant's right to testify can be said to be harmless beyond a reasonable doubt").

The law requires that the Petitioner make a factual showing, and that is clearly met here.  First, as to the right to testify, Kevin Kjonaas has made the factual assertion that he wanted to take the stand, and that had he taken the stand, he would have presented substantial testimony to combat the Government's evidence, or otherwise place it into context.  He would have denied his culpability, as to the conspiracies and as to the stalking charges.  He would have been the conduit for the introduction of speeches, audiotape conversations and documents which evidence his intent and efforts to conduct a lawful political campaign against HLS's abuse of animals.  He would have discussed when he was in control of the website, and his efforts to make it a strictly news/social

media site. He would have testified to his lack of any role in the Texas campaign against Marsh, and his censorship of inflammatory evidence from the website when he had authority to do so. (Kjonaas affidavit, *infra*).

As to several crucial and damning pieces of evidence, Kjonaas could have testified in a manner that was exculpatory. For instance, the Government presented evidence that the pen register at the Home Street address recorded a call to the telephone number of the alleged suspect in the Chiron bombing in California. The Government implied that the call had been made by Kjonaas, and the jury was left with the impression that Kjonaas or some other resident at that address knew the Chiron bomber, and knew of his plan to bomb the plant as the call was made within a half hour of the bombing.

Kjonaas would have testified that he was not at the Home Street residence that day until late in the evening. (Kjonaas Affidavit, paras. 18-19) Indeed, he was in New York City for a demonstration and meetings, and when news of the Chiron bombing hit the media, he was deluged with requests to speak and was kept in the city all day. (Id.) He did not in fact know the suspect, who was apparently a Bay Area animal rights activist unassociated with SHAC USA nor did he have advance notice of the planned bombing, and it was not connected to his campaign activities. (Id.) Had his attorney been aware of this evidence, and discussed it with Kjonaas, he could have attempted to exclude it; in any event, assuming this would have been unsuccessful, Kjonaas could have affirmative denied that he made the call, and told the jury that in actuality the call was one of several made to activists in the Bay Area for a recounting of the news coverage in California; no one at SHAC knew that the bombing would occur, or that this individual was the suspect and this was not the reason for the call. (Id.)

Kjonaas could also testify as to his intent in meeting with various executives at companies associated with HLS. While the Government propounded that his letters and meetings were part of the "direct action" conspiracy, Kjonaas could offer testimony that his intent was  to inform executives of SHAC's position regarding HLS' animal abuses and persuade them to break off relations with the company on this basis; like the demonstrations that were conducted after permits and injunctions and with demonstrably legal imprimatur, Kjonaas' activities in conducting a public relations campaign against HLS were not nefariously motivated. His testimony would have presented the only opposition to the Government's characterization of these activities as illegal, or, if legal, overt acts in the overarching conspiracy because they were done with the intent of threatening or harassing individuals, or violating 18 U.S.C. § 43. Because the jury heard only the Government's side of the case, the actual evidence of SHAC's activities and Kjonaas' role was *de facto* limited to those aspects most prejudicial to the defendant, whereas his testimony, and the documents and tapes he would have introduced, would have at least countered the Government's portrayal of the SHAC USA organization and its members as a terrorist conspiracy.

In sum, petitioner can make the required <u>Strickland</u> showing. He is entitled to an evidentiary hearing to further develop the record as to those events occurring outside the record that are crucial to a full exposition of his claim.

## POINT II

**COUNSEL DENIED HIS CLIENT THE CONSTITUTIONAL RIGHT TO TESTIFY AND DENIAL OF THIS FUNDAMENTAL RIGHT IS STRUCTURAL ERROR AND A VIOLATION OF DUE PROCESS**

A criminal defendant has a constitutional right to testify in his or her own defense. Rock v. Arkansas, supra, 483 U.S. at 49. This right is derived from the Fourteenth Amendment's due process clause, the Sixth Amendment's Compulsory Process Clause, and the Fifth Amendment's prohibition on compelled testimony. Id., 483 U.S. at 51-53. A defendant's right to testify may not be contravened by the attorney, even if the decision causes strategic damage. See United States v. Teague, 953 F.2d 1525 (11th Cir.), cert. denied, 506 U.S. 842 (1992). Defense counsel bears the responsibility for advising the defendant of his right to testify or not to testify, and the strategic implications of each choice; most importantly, defense counsel must make the defendant aware that it is ultimately for the defendant himself to decide to exercise or waive the right. Id. at 1533. Indeed, even if an attorney's advice not to testify would fall into the range of professionally competent assistance, an attorney's failure to permit his client to make that decision with the advice of counsel, cannot be countenanced. United States v. Lore, 26 F. Supp.2d 729, 739-40 (D.N.J.1998).

Because it is so fundamental a right, "[e]ven more fundamental to a personal defense than the right of self-representation", Rock, supra, 483 U.S. at 52, the denial of that right is a denial of the right to due process, and a fair trial. Even before the Supreme Court's pronouncement in Rock, supra, that the right of the accused to testify is more fundamental to a personal defense than the right of self-representation, the deprivation of

the right to testify has been held equivalent to the deprivation of due process and the right to a fair trial.  For example, in <u>United States ex rel. Wilcox v. Johnson</u>, 555 F.2d115, 120 (3rd Cir.1977), the defendant's attorney informed the court that she would withdraw if he testified, asserting, without any solid factual basis that his testimony would be perjured. <u>Id</u>.  Accordingly, the trial court informed the defendant that if he took the stand, the court would permit appointed counsel to withdraw and defendant would have to represent himself.  <u>Id</u>.    Presented with the option of not testifying, or testifying without representation for the remainder of trial, the defendant did not testify.  <u>Id</u>.   The Hobson's choice to which he was put rendered any waiver of his right to testify ineffective, and the Court of Appeals affirmed the district court's granting of habeas relief. <u>Id</u>. at 121.

Similarly, in <u>United States v. Poe</u>, 352 F.2d 639(C.A.D.C. 1965), the failure to inform the defendant of the applicable law regarding use of impeachment material precluded him from making a "meaningful" decision to testify, and thereby deprived him of a fair trial; the trial court's ruling, as affirmed by the higher court, did not frame the issue as one of ineffective representation under the Sixth Amendment, but as a denial of the right to due process.  <u>Id</u>. at 640-41.  These cases predated the Supreme Court's edict that the right to testify was a fundamental, constitutional right.  It should be all the more clear now that there is no due process, and no fair trial, when a defendant has been denied this right by his own attorney.

In the instant case, Kevin Kjonaas was not permitted to make the decision to testify.   Schneider, all too cognizant of his lack of understanding of the complexity of the evidence and the legal issues in the case, was terrified of putting his client on the stand. Notwithstanding the apparent expectations of the client, co-counsel, and even Schneider

himself when he made his opening statement, that Kjonaas' defense would be founded, in part, on his testimony, Schneider did not prepare any direct questions, nor prep his client either with regard to the direct examination or likely avenues of inquiry on cross-examination. (Kjonaas Aff. at paras. 12, 15, 16, 21; Erba Aff., para. 43-44, 46).   In fact, Schneider had only conducted a cursory review of some of the discovery, and lacked a basic grasp of the facts or the legal issues in the case. (McGinty Aff., 33, 38).  Realizing his attorney's failure to prepare or discuss a defense, Kjonaas, in a desperate attempt to salvage his case, enlisted the aid of Ms. McGinty to prepare an extensive direct examination. (Kjonaas Aff. at para.22-24).   When it was clear that even with her assistance, Schneider would be unable to proceed, McGinty urged Schneider to inform his client of his lack of preparedness or alert the Court that he could not, in fact, effectively represent his client. (McGinty Aff, at para. 39).

Schneider did neither.  He informed Kjonaas only that he could not testify, and that it was "not an option."  (Kjonaas Aff., para. 28,29).  He then admitted that he was unprepared to lead Kjonaas through his direct and cross-examination.  (Id.)  Schneider did not tell Kjonaas that he had the right, nevertheless, to take the stand in his own defense, (Id.), and obviously, Kjonaas was not aware that he could, unassisted by counsel, nevertheless testify if he so desired.  This is not a case where defense counsel explained to the defendant his right to take the stand, even against advice of counsel, and persuaded him, instead, that it would be to his advantage to waive that right.  See United States v. Teague, 953 F.2d at 1534-35.  First, Schneider failed to provide Kjonaas with the information needed for him to make a knowing and intelligent decision to exercise, or to waive, his fundamental right to testify. United States v. DiSalvo,  726 F.Supp. 596,

598, 602 (E.D.Pa.1989). Second, and more importantly, Kjonaas was <u>unaware</u> that he had the right to testify, both because Schneider neglected to inform him that the right to decide was exclusively his, and because Schneider affirmatively told him that testifying was "not an option." (Kjonaas Aff. 29). Under such circumstances, there was no waiver, but only a violation of a defendant's constitutional entitlement to testify.

With so fundamental a right at issue, the prejudice analysis seems immaterial. A defendant cannot waive a fundamental right without understanding that right, or the consequences of waiving it. Moreover, there is inherent prejudice when an attorney's advice is guided not by the best interests of his client but by his own interests: the desire to keep himself out of an uncomfortable and difficult situation generated entirely by his lack of preparation and incompetence, or worse yet, to keep from being exposed as lacking the requisite skill and experience to prepare and try a federal case. Putting his own interests above those of his client is exactly what Schneider did, and, in the end, he deprived his client of his constitutionally protected right to testify on his own behalf and, consequently, of the right to a fair trial.

In <u>Palmer v. Hendricks</u>, 592 F.2d 386, 398 (3d Cir.2010), the Court of Appeals for the Third Circuit rejected the notion that the denial of the right to testify qualifies as a structural error, for which no prejudice need be shown. The Court reasoned that unlike other "structural" errors, a defendant's failure to testify can be assessed quantitatively, in the context of the evidence that was presented. <u>Id</u>. at 399. By contrast, "when a defendant is, for example, denied the right to the attorney of his choice, tried before a biased judge, or denied the right to represent himself at trial, the impact of the violation defies harmless error analysis, because any such analysis 'would be a speculative inquiry

into what might have occurred in an alternate universe.'" Id., citing United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006). However, where, as here, an attorney has failed to prepare and present a defense, one important aspect of which is the defendant's own testimony, a "quantitative" analysis of that error in the context of the Government's case amounts to no more than speculation. "Because we cannot truly judge the effect of the defendant's being denied the right to take the stand, and because we should be concerned with protecting both the right to choose whether to testify and the substance of the testimony, reliance on a harmless error standard, or here, a requirement of prejudice, is "misplaced." Wright v. Estelle, 572 F.2d 1701, 1081-82 (5th Cir.1977)(Godblod, J., dissenting). The right to testify is not like other "trial" errors. As Judge Godblod eloquently described in his dissenting opinion in Wright v. Estelle, "[t]he decision whether to testify is a matter of higher quality and dignity than trial happenings such as whether to object to evidence." Id. at 1077. Judge Godblod recognized that like the fundamental personal rights accorded to a defendant, to plead guilty, to ask for a jury, to appeal, and the right to represent oneself, "the defendant's right to testify is fundamental to the dignity and fairness of the judicial process." Id. Like the right to self representation, the right to testify is not amenable to harmless error analysis, because it is a right that when exercised, usually increases the likelihood of a trial outcome unfavorable to the defendant. See McKaskle v. Wiggins, 465 U.S. 168, 177, n. 8 (1984). The decision in Palmer fails to recognize the moral dignity of a defendant's right to testify, and wrongly conditions its protection on the ability of a defendant to demonstrate that its exercise would have resulted in a more favorable outcome.

Here, Schneider did not simply fail to tell Kjonaas that he had the right to testify.

He actually denied his client that right, first by failing to prepare sufficiently and then by telling the client that he could not testify because Schneider "had no questions to ask him". There is no other remedy but a new trial. No prejudice need be shown, though clearly the affidavits of Erba, McGinty and Kjonaas himself demonstrate that Kjonaas' testimony was essential to rebutting the prosecution's case and that he was prejudiced by the lack of any defense. Without a knowing and intelligent waiver of this personal, fundamental right, due process requires a new trial. This Court should grant Petitioner an evidentiary hearing on the showing of facts made in the affidavit.

DATED: March 3, 2012                    Respectfully submitted,


                                        S/_____
                                        Robert G. Stahl
                                        Laura K. Gasiorowski
                                        Law Offices of Robert G. Stahl, LLC
                                        220 St. Paul Street
                                        Westfield, NJ  07090
                                        Attorneys for Petitioner Kevin
                                        Kjonaas

**Robert G. Stahl, Esq.**
**Laura K. Gasiorowski, Esq.**
Law Offices of Robert G. Stahl, LLC
220 St. Paul Street
Westfield, N.J. 07090
908.301.9001
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEVIN KJONAAS,<br>            Petitioner<br><br>    v.<br><br>UNITED STATES,<br>            Respondent | Civ. No. 12-   (AET)<br><br><br>CERTIFICATION OF SERVICE |

IT IS HEREBY CERTIFIED that a copy of the within reply brief was served

electronically, and to the Court, a courtesy hard copy, this 5 day of March, 2012 on:

HONORABLE ANNE E. THOMPSON, Judge
United States District Court
District of New Jersey
402 East State Street-4th Floor
Trenton NJ  08608

Glenn Moramarco, Esq.
United States Attorney for the District of New Jersey
401 Market Street
Camden, NJ 08101


                                        S/Robert G. Stahl
                                        ROBERT G. STAHL